**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00281-CR**
_____

**KIMBERLY BARTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Court at Law No. 2**
**Jefferson County, Texas**
**Trial Cause No. M327556**

**MEMORANDUM OPINION**

A jury found Appellant Kimberly Barton[1] ("Appellant" or "Barton") guilty of

class B misdemeanor theft. *See* Tex. Penal Code Ann. § 31.03(e)(2)(A). The trial

court assessed punishment at 180 days of confinement in county jail, and assessed a

fine of $200 and court costs, but the trial court suspended the sentence and placed

Barton on community supervision for two years. After the trial court found Barton

---

[1] The judgment refers to Barton as "Kimberly Mechelle Barton" or "Kimberly Mechelle Andrews" or "Kimberly Michelle Barton."

1

indigent, the trial court converted the fine and court costs to additional community service hours and ordered that the sentence run concurrently with her sentence in another felony case in trial cause number F13-16714. In three appellate issues, Barton challenges the sufficiency of the evidence supporting the jury's finding of guilt and argues she received ineffective assistance of trial counsel.

Evidence at Trial

Testimony of Jennifer Quick

Jennifer Quick testified that she is employed as the store director at Academy Sports & Outdoors in Port Arthur, Texas, and in June of 2020, she was the logistics manager at the store. Footage from the store's surveillance video of a theft on June 19, 2020, was admitted into evidence and published to the jury, and Quick testified that she had reviewed the footage and that it fairly and accurately depicted the theft that occurred at the store on that date. Quick testified that the footage showed Kimberly Barton, who Quick identified at trial as the defendant, enter the store, take two Yeti coolers valued at $300 each, avoid the checkout, exit the building without paying, and that Barton took the coolers without the store's consent. Quick identified more footage from a different vantage point admitted at trial that depicted the view of the exit door, and Quick testified that the video showed Barton carrying the two coolers she had taken from the display, and the footage shows Barton exiting the store and going towards a vehicle. Quick testified that some of the footage depicted

the "tower" security device "blinking red" when Barton exited the store, and that the blinking light indicates there is still a security tag on the item going out the door which suggests that someone was attempting to take stolen goods outside the store. According to Quick, Barton was ultimately able to get away with stolen coolers. On cross-examination, Quick acknowledged that she personally did not see Barton take the coolers and she did not know if she was at the store when the events depicted in the video footage occurred. She clarified that she later was able to review the surveillance footage through the store's surveillance system, and that she recognized Barton from several instances of Barton being in the store and that "every instance was a theft incident." Quick testified that her identification of the person in the video as Barton was based on "previous encounters[,]" that Barton has a distinct walk and tattoos including tattoos on the neck and a teardrop tattoo on her face that helped her identify Barton as the individual in the footage, and that the individual in the footage was wearing the exact same "ripped up jeans and the T-shirt[]" that Barton had worn to the store on a previous occasion. According to Quick, the store's loss prevention team previously had Quick review video footage of the store's repeat offenders, and she had reviewed footage of three instances prior to this instance where the same person stole merchandise from the store. Quick testified that the store's loss prevention file of the perpetrators in these types of videos contains names of offenders who have had "no trespasses [] administered," and that she was informed

3

by the loss prevention team that the person in the videos of the three prior instances was Kimberly Barton. According to Quick, she was able to compare the person identified as Kimberly Barton in those earlier surveillance videos with the store's surveillance videos from June 19, 2020, and she determined that it was the same person because of the facial tattoos. She acknowledged that zoomed-in images purportedly of the surveillance videos from June 19, 2020 provided to her at trial by the defense and that were admitted at trial were too distorted to show the facial tattoos, but she testified that she was able to see a clearer depiction of the facial tattoos from zoomed-in photographs of the store's video footage. Quick testified that she did not have those photographs, that they should have been provided to the State, and that, to her knowledge, there was no reason why they would not have been provided to the State.

Testimony of Charles Golden

Charles Golden testified that on June 19, 2020, he was the operations manager at Academy and contacted law enforcement regarding a shoplifting incident. According to Golden, the incident was captured by the store's security system, and he and others in the store and the store's loss prevention department reviewed the footage. Golden testified that when a suspected crime occurs at the store and is caught on camera, the store sends the footage to loss prevention at Academy's corporate office, and loss prevention would handle forwarding it to law enforcement.

4

The video footage was again played for the jury and Golden described what transpired in the footage as follows:

> . . . . Basically, Ms. Barton walks into the store, walks around the customer service area, picks up two Yeti coolers. I think they were Yeti Hoppers. I don't remember that model for sure, walked back to the end of the customer service, acted like she was looking at some sunglasses and then circles back around when she thinks nobody's looking and walks out the door with them as a couple of our associates follow her to the parking lot.

Golden testified that two Academy associates followed Barton out of the store but did not leave the sidewalk because employees are not allowed to follow a suspect "all the way out." Golden testified that the footage shows that one of the two associates, Jerry Nichols, was working nearby when the incident happened, but Golden did not remember the other associate's name or where they were in the store at the time of the incident. Golden testified that Barton left in a vehicle with the coolers.

Golden testified that, based on his personal knowledge, he believed the person in the footage was Barton because he had seen her numerous other times in the store. He identified the defendant as Barton and as the person depicted in the footage that took the Yeti coolers. Golden also identified Barton as the person in other footage from that same occurrence, and he testified the footage depicts Barton exiting the store without paying for the Yeti coolers and Barton carrying the Yeti coolers in the store's parking lot.

5

According to Golden, he did not immediately report the incident to law enforcement because at the time of the offense Golden was setting up a boat and trailer for a customer on the side of the building. Golden agreed that he did not personally see the person who shoplifted the coolers, and his knowledge was based on the surveillance video footage. Golden testified that Barton did not have any consent to take the coolers and did not appear to have any intent to come back and pay for them. Golden first reviewed the footage two or three days later with Jennifer Quick, who was the manager on duty that day, and another manager, Donald Durrell. Golden testified that the store has a "paperwork system" to track repeat offenders of bad acts on the store's property, and that the store provides the police with copies of criminal trespass warnings and reports on repeat offenders. According to Golden, there was a report in the store's system for Barton, and he provided that information to law enforcement.

Golden agreed that the store's surveillance system had no way of enhancing the footage, but that the footage could be paused and zoomed-in on. He also agreed that it was impossible in the video footage admitted at trial to see the perpetrator's face or details on the face such as tattoos. Golden testified that he had face-to-face personal interactions at least two times with Barton prior to this incident, the police were called, and she was issued a criminal trespass warning. According to Golden, on those prior occasions, Barton was "attempting to take things and when we

confronted her, she had actually put them down and tried to leave the store." Golden testified that although Barton had stolen from the store many times, no theft charges were brought because law enforcement would arrive to the store after she left. According to Golden, Barton typically wore the same type clothes, the torn jeans and a hat, and "always held her head down when she walked in the door past the cameras[.]" It was Golden's belief that, based on her clothing, behavior, and build, that the person in the video footage was Barton. Golden testified that based on his prior encounters with her in the store and her usual attire and behaviors, he identified the person in the footage admitted at trial as the defendant, Kimberly Barton.

Testimony of Sergeant Granger

Sergeant Adam Granger with the Bridge City Police Department testified that on June 22, 2020, he was a patrol officer with the Port Arthur Police Department and responded to a call at Academy regarding a theft. Granger testified that through his investigation he spoke with Golden and Quick, who discussed the facts surrounding the theft, and they reported Barton as the perpetrator. Granger testified he reviewed the security footage at the store and submitted an "ID request" so that detectives with his department would later collect the footage.

Testimony of Kimberly Barton

Kimberly Barton testified that she was not at that Academy on June 19, 2020, she denied that the video footage admitted at trial depicted her, and she testified that

7

she has "never committed a theft in [her] life." On cross-examination, Barton admitted that she had been "trespassed warned" from the Academy in Port Arthur before, but she testified that "it wasn't because [she] was stealing[,] [i]t was because [she] was with somebody stealing." She initially denied that in July of 2020 she pleaded "no contest" to a trespassing case, but when the prosecutor questioned her about a judgment admitted at trial that indicated that Barton pleaded "no contest" to trespass on July 29, 2020, Barton acknowledged that she pleaded "no contest" to trespassing at Academy. She also testified that she has been previously convicted for a drug-related felony, and that she had one year remaining of her ten-year probation for that offense.

## Sufficiency of the Evidence

In issues one and two, Barton challenges the sufficiency of the evidence supporting the jury's finding of guilt. In her first issue, she argues that the jury erred in finding that she was guilty of theft when the State's evidence was insufficient on the identity issue. According to Barton, none of the State's witnesses were reliable on the identity issue and that the State's witnesses "were only speculating that the Appellant was the perpetrator or suspect." In her second issue, she argues that the jury erred in finding that the State had proven beyond a reasonable doubt that she and the perpetrator of the offense are the same person "when the evidence was both factually and legally insufficient." Because her first two issues argue that there was

8

insufficient evidence to support the jury's finding that she was the same person who committed the theft, we consider issues one and two together.

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 326); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). The appellate court does not reweigh the evidence nor determine the credibility of the evidence, nor does it substitute its own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

9

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

A person commits theft if with intent to deprive the owner of property, she unlawfully appropriates the property "without the owner's effective consent[.]" Tex. Penal Code Ann. § 31.03(a), (b)(1). "Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence." *See Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018) (citing *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009)). The identity of the defendant as the perpetrator of the alleged crime may be proven by inferences, and when there is no direct evidence of the perpetrator's identity elicited from trial witnesses, no formalized procedure is required for the State to prove the identity of the defendant as the perpetrator of the crime. *Clark v. State*, 47 S.W.3d 211, 214 (Tex. App.—Beaumont 2001, no pet.).

The jury heard Quick testify that she recognized Barton from several instances of Barton previously being in the store, that she had in the past viewed footage provided by the loss prevention team of a person identified to her as Barton committing theft in the store on three occasions, that the person in those videos was the same person in the footage in this case, and that she identified Barton as the offender in this case also based on Barton's distinguishing walk, tattoos, and familiar clothing. The jury heard Golden testify that he identified Barton as the perpetrator in the store's surveillance footage based on prior face-to-face encounters in the store when Barton's attempt to commit theft was thwarted and law enforcement ultimately issued a criminal trespass warning. The jury also heard Golden testify that he identified Barton based on her familiar clothing, behavior, and build. Furthermore, the jury had the opportunity to view the footage and photographs admitted at trial and observe Barton at trial. The jury could have disbelieved Barton's testimony that she was not at the Academy in question on the date of the offense and could have disbelieved her testimony that she did not steal the coolers as alleged by the State. *See Margraves*, 34 S.W.3d at 919. Direct evidence is not required, and the fact that none of the State's witnesses at trial saw the offense when it happened does not mean the evidence is insufficient to support the jury's finding. *See Clayton*, 235 S.W.3d at 778.

Having viewed the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have found beyond a reasonable doubt that Barton was the person who took the coolers from Academy without paying for them and without consent. *See Jackson*, 443 U.S. at 319; *Temple*, 390 S.W.3d at 360. The jury was able to assess the credibility and demeanor of the witnesses who testified at trial, and we presume that the jury resolved all conflicts in the testimony, weighed the evidence, and drew reasonable inferences from the evidence in a manner that supports the verdict. *See Hooper*, 214 S.W.3d at 13; *Brooks*, 323 S.W.3d at 899 n.13; *Clayton*, 235 S.W.3d at 778. The jury could have reasonably inferred from the evidence presented that Barton was the person that committed the theft. "This was not a determination so outrageous that no rational trier of fact could agree." *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012). We overrule issues one and two.

Allegations of Ineffective Assistance of Counsel

In issue three, Barton argues that her counsel was ineffective in representing her because he was not prepared, he should have "cross-examined the State's witnesses more zealously and th[o]roughly on the issue of identity in regard to the store surveillance tape[,]" and he should have been more attentive when the State was presenting its case.

Both the United States Constitution and the Texas Constitution guarantee an accused the right to assistance of counsel. U.S. Const. amend. VI; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 1.051. This right necessarily includes the right to reasonably effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Ex parte Gonzales*, 945 S.W.2d 830, 835 (Tex. Crim. App. 1997). With respect to an ineffective assistance claim, our review of counsel's performance is highly deferential, and we make a strong presumption that counsel's performance fell within the wide range of reasonably professional assistance. *Strickland*, 446 U.S. at 689; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (citing *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006)). To overcome that presumption, Appellant must satisfy the two prongs established by *Strickland v. Washington* by demonstrating that (1) counsel's representation fell below an objective standard of reasonableness, and (2) deficient performance prejudiced the defense. *Lopez*, 343 S.W.3d at 142 (citing *Strickland*, 466 U.S. at 687); *see also Hernandez v. State*, 726 S.W.2d 53, 55-56 (Tex. Crim. App. 1986) (adopting and applying the *Strickland* test). Under *Strickland*, first, the defendant "must prove, by a preponderance of the evidence, that there is, in fact, no plausible professional reason for a specific act or omission." *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Second, the defendant must demonstrate prejudice from the attorney's performance. That is, considering the totality of the evidence before the judge or

jury, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 696. "Unless [an] appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective." *Lopez*, 343 S.W.3d at 142 (citing *Strickland*, 466 U.S. at 687).

The record must contain evidence of counsel's reasoning, or lack thereof, to rebut the presumption that counsel's performance fell within the wide range of reasonably professional assistance. *Ortiz v. State*, 93 S.W.3d 79, 88-89 (Tex. Crim. App. 2002) ("If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal."). "When such direct evidence is not available, we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined." *Lopez*, 343 S.W.3d at 143 (citing *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

"An appellate court looks to the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Ex parte Felton*, 815 S.W.2d 733, 735 (Tex. Crim. App. 1991)). Allegations of ineffectiveness must be shown in the record, and the record must affirmatively establish the alleged

ineffectiveness. *See id.* Ordinarily, on direct appeal, the record will not have been sufficiently developed during the trial regarding counsel's alleged errors to demonstrate in the appeal that trial counsel provided ineffective assistance under the *Strickland* standards. *Menefield v. State*, 363 S.W.3d 591, 592-93 (Tex. Crim. App. 2012); *Lopez*, 343 S.W.3d at 143. Before we denounce trial counsel's actions as ineffective, counsel should normally be given an opportunity to explain the challenged actions. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). When counsel has not been given an opportunity to explain the challenged actions, we will find deficient performance only if the conduct was "'so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *Garcia*, 57 S.W.3d at 440).

"To show prejudice, 'the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (quoting *Strickland*, 466 U.S. at 694); *see Bone*, 77 S.W.3d at 833 (appellant must demonstrate a reasonable probability that but for defense counsel's errors, the outcome would have been different). Thus, a defendant must show "that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result was reliable." *Strickland*, 466 U.S. at 687. It is not sufficient for

the defendant to show "that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693.

One of Barton's ineffective-assistance-of-counsel complaints is that defense counsel failed to cross-examine the State's witnesses "more zealously and th[o]roughly on the issue of identity in regard to the store surveillance tape." "Cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial." *Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005) (orig. proceeding) (citing *Coble v. State*, 501 S.W.2d 344, 346 (Tex. Crim. App. 1973)). "Furthermore, cross-examination is an art, not a science, and it cannot be adequately judged in hindsight." *Id.* "If unsuccessful, 'cross-examination can serve to bolster the credibility of the witness and underscore the very points that are sought to be impeached.'" *Dearing v. State*, No.06-22-00065-CR, 2022 Tex. App. LEXIS 6896, at *17 (Tex. App.—Texarkana Sept. 13, 2002, no pet.) (mem. op., not designated for publication) (quoting *Jones v. State*, 500 S.W.3d 106, 115 (Tex. App.—Houston [1st Dist.] 2016, no pet.)); *see also Ex parte McFarland*, 163 S.W.3d at 756 n.40 (citing *Dannhaus v. State*, 928 S.W.2d 81, 88 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd)).

We note that Barton's counsel devoted much of his cross-examination of the State's witnesses to the identity of the perpetrator in the surveillance footage. Our review of the record indicates that Barton did not file a motion for new trial and did

not afford her counsel an opportunity to explain himself. Without more, we cannot evaluate whether counsel had a reasonable reason for not cross-examining the witnesses more vigorously about the store surveillance footage. *See id.* at \*\* 17-18. Here, counsel could have been afraid that the witnesses' answers to further cross-examination could strengthen their testimony or otherwise strengthen the State's case. Because there is a plausible professional reason for counsel's actions, the argument fails to satisfy the first prong of *Strickland*. *See Bone*, 77 S.W.3d at 836.

As for Barton's general complaints that her trial counsel was unprepared and inattentive during the State's presentation of its case, Appellant's brief does not provide any substantive analysis nor does Appellant point to record references to show the purported inattentiveness or how counsel was unprepared, and Appellant fails to show how the conduct constituted a deficient performance. Appellant has therefore waived review of these arguments. *See* Tex. R. App. P. 38.1(i) (To assert an issue on appeal, an appellant's brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Lucio v. State*, 351 S.W.3d 878, 896-97 (Tex. Crim. App. 2011) (an appellant waives an issue on appeal if she does not adequately brief the issue by providing supporting argument and appropriate citations to authorities and to the record).

Furthermore, Appellant's brief fails to present argument as to how she was prejudiced by any of her trial counsel's alleged deficiencies other than her conclusory statements that those alleged deficiencies caused her to "suffer[] prejudice[,]" "suffer greatly[,]" and that if her counsel had not committed the alleged deficiencies Appellant "would have not be[en] found guilty of the offense of theft." A conclusory statement that the defendant was prejudiced by her trial counsel's allegedly deficient performance is inadequate to establish prejudice under *Strickland. See Ex parte Parra*, 420 S.W.3d 821, 828 (Tex. Crim. App. 2013). We conclude that Appellant has not met her burden to show that her trial counsel's performance was deficient or that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Bone*, 77 S.W.3d at 833. Accordingly, we overrule issue three.

We note that the section of the judgment entitled "Plea to Offense" states "Guilty[,]" but the reporter's record reflects that Barton pleaded "not guilty." This Court has the authority to reform the trial court's judgment to correct clerical errors. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993). We therefore reform the trial court's judgment to delete the plea of "Guilty" and substitute "Not Guilty."

Having overruled Appellant's issues, we affirm the trial court's judgment as reformed.

AFFIRMED AS REFORMED.

LEANNE JOHNSON
Justice

Submitted on April 11, 2024
Opinion Delivered May 1, 2024
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.